## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FLORENCE M. ALFANO,

    Plaintiff,

v.              ACTION NO. 2:13cv330

CAROLYN W. COLVIN,

    Defendant.

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB") pursuant to section 205(g) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be VACATED and REMANDED to the Commissioner for further analysis consistent with this Report and Recommendation.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively applied for DIB on January 2, 2010, alleging disability since July 1, 2006, caused by atherosclerotic heart disease, lumbar degenerative disease, high blood pressure,

osteoporosis, hyperlipidemia, and asthma. R. 139-40, 173.[1]  Plaintiff's application was denied initially and on reconsideration. R. 74-99. Plaintiff requested a hearing by an Administrative Law Judge (ALJ), which was held on October 5, 2011. R. 40-67. Plaintiff, represented by counsel, and a vocational expert testified before the ALJ. R. 40-67.

On October 27, 2011, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. R. 21-39. The Appeals Council denied Plaintiff's request for administrative review of the ALJ's decision. R. 1-6. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

## II. FACTUAL BACKGROUND

A.    Plaintiff's Background

Born in 1952, Plaintiff was fifty-four years old on her alleged onset date, and fifty-nine years old when the ALJ rendered his decision. R. 139. Plaintiff finished high school, and worked as a data control tech for the City of Chesapeake from 1995 through 2006. R. 174-75.

B.    Plaintiff's Medical History

In March 2003, Plaintiff was seen by Joseph L. Koen, M.D., a neurosurgeon, due to low back pain radiating into her leg. R. 776. Dr. Koen noted Plaintiff underwent a right L5-S1 discectomy in September 1999, "with good result[s]." R. 776. An MRI revealed a new disc rupture at L5-S1, which Dr. Koen repaired surgically. R. 776-78. At Plaintiff's post-surgery follow-up appointment, Dr. Koen observed that Plaintiff "continues to have complete relief of her pain," has residual tingling, but "is very pleased with her progress." R. 698. Noting that Plaintiff's strength was normal and that Plaintiff was "doing well," Dr. Koen advised that he would see Plaintiff on an "as needed basis" only. R. 698.

---

[1] The citations in this Report and Recommendation are to the Administrative Record.

On May 11, 2005, Dr. Koen recounted that Plaintiff had been bothered "with progressive right lower limb discomfort and pain," described as "deep aching pain into the anterior right leg," along with "some low back pain." R. 257. Dr. Koen ordered flexion and extension x-rays and an MRI scan. R. 258. The flexion and extension views of the lumbar spine showed no instability. R. 256.

On June 8, 2005, Plaintiff reported to Dr. Koen that she was experiencing back pain, as well as posterior thigh and right leg pain that radiated to the ball of her foot with paresthesia. R. 256. Dr. Koen noted that "[h]er MRI scan demonstrates a new disc herniation at L4-5 centrally." R. 256. Dr. Koen determined Plaintiff "is symptomatic with L5 radiculopathy, more on the right side at this point." R. 256. It was determined that Plaintiff would try a course of physical therapy as well as a course of epidural steroid injections. R. 255-256.

During a follow up appointment on August 24, 2005, Dr. Koen noted that Plaintiff had undergone two epidural injections, and attended physical therapy. R. 253. Plaintiff reported less numbness in the right lower limb, and was "somewhat better" after the injections. R. 253. She was experiencing some pain in the left hip area. R. 253.

On March 3, 2006, Kenneth Mayer, M.D., completed a disabled parking application and certified that Plaintiff's ability to walk was permanently limited or impaired due to her degenerative disc disease. R. 626. The same day, Dr. Mayer opined in a certification pursuant to the Family Medical Leave Act ("FMLA") that Plaintiff could be incapacitated up to three days per month, possibly "longer for escalating" symptoms. R. 627. When asked whether Plaintiff was "unable to perform work of any kind," Dr. Mayer responded "no." R. 628.

On March 7, 2006, Martin V. Ton, M.D., administered an additional epidural injection after noting that Plaintiff's August 2005 injection had provided partial relief for three months. R.

3

250-251.

An MRI, performed on March 20, 2006, showed some progression of the moderate sized L4/L5 "central disc protrusion/extrusion with decreased indentation and mass effect on the thecal sac but continued narrowing of the lateral recesses" along with a "[b]road-based left paracentral/foraminal disc bulge L5/S1 . . . with moderate left neural foraminal stenosis." R. 956.

Approximately three weeks after the March 29, 2006 injection, Plaintiff was noted by Dr. Koen to be doing better, although she was still "having some bilateral leg symptoms, more down the right lower limb." R. 252.  Plaintiff was able to toe and heel walk at that point, with good strength. R. 252.  Dr. Koen noted that the recent follow-up MRI scan revealed some apparent progression of her disc herniation at L4/5.  R. 252.  Dr. Koen related that he would not recommend surgery to fix the ruptured disc at that time. R. 252.

A May 5, 2006 note indicated Plaintiff was fatigued, drowsy, and prone to falling asleep at work. R. 483.  Plaintiff reported a lot of stress at work and at home, but reported no trouble sleeping. R. 483.

At a follow-up cardiology appointment with Sanjay G. Shah, M.D., on June 8, 2006, Plaintiff reported fatigue, occasional shortness of breath, nonexertional chest pain, and cramps. R. 335.  She had 50-55% lesion of the ostium of the first diagonal. R. 335.  Her stress test was negative, and her echocardiogram showed a normal LV function. R. 335.  Dr. Shah indicated he would see her as needed from a cardiac standpoint and advised Plaintiff to quit smoking. R. 335.

On June 13, 2006, Susan Kim-Foley, M.D., Plaintiff's family physician, diagnosed, among other things, chronic back pain with disc disease and depression. R. 475.  It was noted that Plaintiff had been seeing a pain management specialist along with Dr. Koen, the

4

neurosurgeon. R. 475. Plaintiff was referred back to Dr. Koen. R. 475. She was also advised to follow up with her psychiatrist, and advised against "coming off the Effexor XR" given that she continued to have some ongoing depression. R. 475.

Plaintiff alleges a disability onset date of July 1, 2006. R. 139.

On July 25, 2006, Plaintiff asked Dr. Kim-Foley to fill out disability papers on her behalf. R. 471. Dr. Kim-Foley declined, stating she could not give an unbiased opinion about Plaintiff's health, being a family physician, and advised Plaintiff to either get an independent physician's opinion regarding her ability to work, or to speak with her cardiologist or neurosurgeon. R. 471-72. On physical examination, Dr. Kim-Foley observed that Plaintiff's blood pressure was a little high at 138/82, and Plaintiff had a regular heart rate without any murmurs, rubs or gallops. R. 472.

In October 2006, Plaintiff reported to Dr. Kim-Foley that her fatigue was better after cutting back on Toprol, though she still felt tired by two or three o'clock. R. 464. With respect to her hyperlipidemia, Plaintiff's LDL was not quite at goal, and Dr. Kim-Foley increased her Zocor prescription. R. 464. Dr. Kim-Foley asked Plaintiff to reduce her intake of carbohydrates and "[s]trongly advised [Plaintiff] to quit smoking." R. 465.

Abnormal fasting glucose and restless leg syndrome were diagnosed in July 2007 by Dr. Kim-Foley. R. 447. Plaintiff was "anxious to try medication to help her sleep better." R. 447.

A bone density study conducted in February 2008 showed osteopenia and a high risk of fracture. R. 570-571.

Plaintiff was seen by Dr. Kim-Foley on March 17, 2008, for sharp, recurrent epigastric pain, and was sent to the emergency room. R. 349-351, 434. The etiology of her abdominal pain was unclear, according to Francis E. Watson, M.D. R. 350. Testing disclosed ileal wall

thickening consistent with an acute inflammatory process, and Crohn's disease was suspected. R. 355. Plaintiff exhibited normal cardiovascular function and a normal stance and gait. R. 350. Plaintiff was released "without limitations," and a recommendation that a colonoscopy be performed when Plaintiff was clinically stable. R. 349-50.

On November 2, 2009, Plaintiff reported to Naval Medical Center Portsmouth with complaints of chest pain. R. 361. The examination revealed normal heart sounds and lungs that were clear to auscultation. R. 361. Plaintiff underwent an exercise stress test, and the results were normal. R. 362.

On May 23, 2010, Gustavo Vargas, M.D., a state agency consultant, performed a physical examination of Plaintiff and produced a medical consultant report. R. 369-376. Dr. Vargas found Plaintiff to be a good historian, and summarized her symptomatology. R. 369-70. With respect to her atherosclerotic heart disease, Plaintiff described tiredness and shortness of breath for the previous nine to ten years. R. 369. Plaintiff stated emotional stress was a precipitating factor to these symptoms, and Nitroglycerin gave some relief. R. 369. Plaintiff stated that her lumbar degenerative disease had been treated with two laminectomies, pain medication, and muscle relaxants. R. 370. She explained she had a "successful outcome following this treatment." R. 370. Dr. Vargas noted, "[a] further, more-detailed questioning to clarify further this condition was not carried out, because she appeared to be uncomfortable emotionally." R. 370. Dr. Vargas also noted that Plaintiff worked for the Chesapeake Community Service Board for eleven years, but discontinued working "due to a conflict with her boss." R. 372.

Dr. Vargas provided a "pertinent summary of the available records," listing: Dr. Koen's evaluations dated June 8, 2005, and March 29, 2006, a 2008 bone scan, a 2008 CT scan of the abdomen, a 2009 x-ray of the right hip, a 2009 comprehensive metabolic panel and lipid profile,

a 2009 chest x-ray, a 2009 left knee x-ray, and an exercise stress test. R. 370-71. Dr. Vargas did not include any MRI results in his summary. Plaintiff reported smoking one pack of cigarettes daily. R. 372.

Plaintiff walked normally into the examination room, and needed some assistance to get on and off of the examination couch. R. 373. On examination, Plaintiff could touch her toes, walk on her heels and tiptoes, and perform tandem walking. R. 374. Plaintiff had a full range of motion of her cervical spine and lower extremities, with 5/5 motor strength. R. 374. Dr. Vargas noted that her cardiac sounds were "of normal characteristics" and that her heart rhythm was regular. R. 374.

Dr. Vargas diagnosed, "coronary artery disease with historical evidence of stenosis of one of the main coronary arteries," "lumbar degenerative disk disease, status post two laminectomies," and "hypertension without injury to vital organs." R. 375. Dr. Vargas found Plaintiff was able to walk for half a mile with breaks, sit for one hour, stand straight for half an hour approximately, and had no limitations for fine finger manipulation. R. 375. Dr. Vargas further concluded she has "moderately frequent limitations for lifting weights about 40 pounds in a sporadic fashion," "moderately frequent limitations for assignments in extreme climatic conditions," "moderate limitations for frequent activity going up and down stairs and ladders," possible "slight limitation for working on scaffolds and planks," "moderate limitations for persistent bending and crouching," and, no "overt limitations for interpersonal relationships because she does not have any crippling psychiatric disease such as psychosis." R. 375.

Plaintiff was seen at Portsmouth Gastroenterology Diagnostic Center on May 24, 2010, reporting rectal bleeding for months. R. 1089. Examination by Joseph B. Hollis, M.D., and June Lankford, FNP-C, revealed periumbilical abdominal pain with nausea and blood in the stool. R.

1090. A colonoscopy was scheduled. R. 1090.

On June 3, 2010, Plaintiff underwent a colonoscopy, which revealed internal hemorrhoids and "extensive diverticular disease." R. 378. Plaintiff was noted to "have symptoms of irritable bowel syndrome with alternating bouts of diarrhea and constipation." R. 378.

On June 10, 2010, Carolina Longa, M.D., a state agency expert physician, reviewed Plaintiff's medical record and opined that Plaintiff's "condition is not of the level of severity to be disabling." R. 84-85. In support of this determination, Dr. Longa noted that the medical evidence showed that Plaintiff had a good ability to stand and walk throughout a normal workday; that Plaintiff's atherosclerotic heart disease had not resulted in severe complications; that Plaintiff's asthma problems were infrequent and could be controlled with medication; and that Plaintiff's overall condition did not preclude her from performing all work activities. R. 84.

Increased pain and numbness were documented on July 16, 2010, at which time it was also noted that Dr. Koen did not take Plaintiff's insurance. R. 399. On examination, Dr. Kim-Foley noted decreased sensation, slow gait, pain on range of motion testing, and lumbar spine tenderness to palpation. R. 401.

A lumbar MRI report, from an examination completed on July 22, 2010, noted chronic back pain that had been "worsening over the past 4-5 months." R. 558.[2] The radiologist

---

[2] Images demonstrated abnormalities including (1) "[s]evere loss of disc space height at L5/S1 with desiccative change"; (2) "focal bone marrow edema within the posterior superior endplate of L5 with milder diffuse marrow edema throughout the entire L5 vertebral body"; (3) "[d]egenerative endplate changes present at L4-S1"; (4) "a large enhancing defect in the ventral central margin of the [L4/L5] disc, with confluence enhancing soft tissue in the ventral epidural compartment, moderately deforming the ventral thecal sac" and "significantly progressed since 2006[,]" representing either scar tissue or a "large volume of extruded disc material"; (5) "[c]entral spinal canal is further compromised by moderate degenerative hypertrophic changes of the ligamentum flavum and bilateral facets"; (6) "suggestion of a recurrent [L4/L5] disc protrusion along the right posterolateral corner of the disc, and extending into the right neural foramen which demonstrates pericpheral enhancement"; (7) "[f]oraminal component of [L4/L5] disc and degenerative facet arthropathy contribute to progressive right foraminal stenosis since March 2006 examination, now with near-complete effacement of perineural fat surrounding the right L4 nerve root"; (8) "[p]otential for impingement of the crossing L5 nerve roots bilaterally, particularly on the right"; (9) "moderate-severe right and severe left neural foraminal stenosis" at L5/S1; (10) "mass effect on the left L5 nerve root, suggesting impingement" and (11) "abutment of the crossing S1 nerve roots bilaterally[.]" R. 558-559.

summarized the results as demonstrating "[p]ostsurgical changes at L4/L5 and L5/S1, with moderately progressive presumed scar tissue in the ventral epidural space at L4/L5 and behind L5 vertebral body, with encasement of the right greater than left S1 nerve roots at the L5/S1 level since March 2006.  Recurrent central canal stenosis at L4/L5, due to recurrent disc protrusion and moderate degenerative changes of the ligamentum flavum and facet joints, with potential for impingement of the crossing L5 nerve root as above.  Foraminal stenoses are most pronounced on the left at L5/S1 where there is severe foraminal stenosis and likely impingement of the L5 nerve root." R. 559-560.

Lumbar X-rays taken on July 22, 2010, were able to disclose (1) mild scoliosis of the lumbar spine; (2) "significant facet arthropathy at L5-S1 and possibly at L4-5, bilaterally"; and (3) "mild-to-moderate narrowing at L4-5 and moderate narrowing at L5-S1." R. 561.

On July 29, 2010, cerebrovascular duplex testing revealed "50-69% stenosis in the right internal carotid artery," antegrade flow in both vertebral arteries, and irregular plaque. R. 1078.

In August 2010, Plaintiff presented to Dr. Kim-Foley complaining of light-headedness when standing up. R. 397.  Her cardiovascular function was normal, as was the remainder of her physical examination. R. 398.  Dr. Kim-Foley advised Plaintiff to stop smoking. R. 398.

On September 1, 2010, Plaintiff was seen at the neurosurgical clinic, after referral by Dr. Kim-Foley, to be treated for back pain and bilateral lower extremity numbness. R. 895.  Plaintiff related difficulty walking and increased back pain as well as "lower extremity symptoms as a result of activity." R. 897-898.  On physical examination, Plaintiff exhibited full muscle strength in the lower extremities, intact sensation, full range of lumbar motion, negative straight leg-raising, normal gait, and intact heel-toe and tandem walking. R. 897.  Samuel D. Critides, M.D., assessed a central herniated nucleus pulposus L4-5 with moderate central canal stenosis and

central disk protrusion at L5-S1.  R. 897.  Dr. Critides explained the MRI findings to Plaintiff, including the disc herniation and central canal stenosis at L4-5, which could explain some of the symptoms she was experiencing, though he remarked that it was unclear as to why Plaintiff experienced numbness in the inner aspect of her left leg.  R. 897.  Dr. Critides recommended that Plaintiff consult with physical therapy and consider steroid injection therapy with a pain management specialist.  R. 898.

An operative report from Dr. Gauthier, with Chesapeake Pain Medicine, dated September 14, 2010, describes administration of a caudal epidural steroid injection.  R. 985.  Dr. Gauthier assessed lumbar postlaminectomy syndrome with recurrent herniated nucleus pulposus causing radiculopathy.  R. 986.

A letter dated September 27, 2010, states that Plaintiff presented to physical therapy "with signs and symptoms consistent with herniated nucleus pulposus with radicular symptoms." R. 855.  The physical therapist noted objective findings of positive FABER's testing; reduced strength of 4/5 regarding hip flexion and adduction, right knee extension, and left plantar flexion, with 3/5 right plantar flexion; "poor sitting posture with a forward head, protracted shoulders, decreased lordosis, and increased kyphosis"; and tenderness to palpation in several areas.  R. 855.  The plan was for Plaintiff to attend physical therapy two to three times a week for four to six weeks.  R. 856.  A note dated November 9, 2010, indicates that Plaintiff did not believe physical therapy was helping much, she was financially strapped, and she was not sure if she was coming back for further physical therapy.  R. 847.

In November 2010, Patricia Staehr, M.D., another state agency disability expert, reviewed Plaintiff's record and concurred in Dr. Longa's June 2010 assessment that Plaintiff's overall condition did not preclude her from performing all work activities.  R. 87-98.

An "Acute Visit" note from Dr. Kim-Foley on November 29, 2010, states that Plaintiff was a passenger in a vehicle that was rear-ended on November 10, 2010, leading to worsening of her preexisting lower back problems. R. 1032-1033. Lumbar X-rays taken on November 29, 2010 showed "a 6mm retrolisthesis of L5 on S1 which is new since the prior study." R. 867. Accordingly, the radiologist concluded there was "[i]nterval development of grade 1 retrolisthesis of L5 on S1 compared to the prior study 7/22/10, suggesting L5 spondylolisthesis." R. 867.

At a follow-up appointment with Dr. Critides on December 29, 2010, Plaintiff reported lower back pain, numbness, and tingling down her right leg. R. 881, 939. She was still smoking and stated that she was recently in a car accident. R. 881. Dr. Critides found intact neurological functioning and noted that Plaintiff had no difficulty getting on and off of the examining table. R. 882. He recommended she receive another injection, and released Plaintiff without limitations. R. 882.

Plaintiff received an injection on January 5, 2011. R. 981. An office telephone note, dated January 18, 2011, indicates Plaintiff reported improvement following the injection, but that her leg cramps were worsening. R. 979.

Dr. Kim-Foley conducted a complete physical exam of Plaintiff on July 26, 2011. R. 1001-1004. Plaintiff denied shortness of breath and wheezing; did not report any muscle aches, abdominal pain, chest pain or joint pain; and, reported no numbness, weakness or difficulty walking. R. 1002. Her physical examination revealed no abnormalities in breathing or cardiac function, no muscle spasms, no bony abnormalities, and a normal gait. R. 1003. Plaintiff's LDL level was not at goal, and Dr. Kim-Foley changed her medication to Lipitor. R. 1004. Dr. Kim-Foley refilled Plaintiff's nitro patch prescription, and encouraged a healthy diet and daily

11

exercise. R. 1004.

On August 3, 2011, Plaintiff's attorney took the recorded statement of Dr. Michael E. Gauthier with Chesapeake Bay Pain Medicine. R. 926-35. Prior to the interview, Plaintiff's attorney provided Dr. Gauthier with a copy of "all of the probably important historical records, maybe about 20 pages, that includes all of her MRIs, all of her surgeries, her physical therapy and her previous pain management treatment" that Plaintiff's attorney deemed to be "good mileposts" regarding Plaintiff's condition. R. 44. Dr. Gauthier testified that he had been practicing in pain management since 1995, and he began treating Plaintiff for her ongoing, chronic pain following a referral by the Portsmouth Naval Neurosurgery Center. R. 926-927. Dr. Gauthier performed two epidural steroid injections, one in September 2010 and one in January 2011. R. 927.

Dr. Gauthier testified Plaintiff's primary diagnosis was "lumbar radiculopathy, pinched nerve and multiple levels of degenerative changes within her lumbar spine." R. 927. Dr. Gauthier stated that, at the time he began Plaintiff's treatment he had the results of the MRI performed on July 22, 2010. R. 927. The MRI showed scar tissue from her previous surgeries, a herniated disc causing stenosis that may have been impinging the L4-5 nerve roots, and a large, severe spinal foraminal stenosis that may have been affecting the L5 nerve root on the right side. R. 927-28. Dr. Gauthier explained that Plaintiff, "has several things that can be leading to a pinched nerve and her radiculopathy. The herniated disk, the epidural scar tissue and the foraminal stenosis. Stenosis means the hole is too small for the nerve root to function properly." R. 928.

After comparing the 2010 MRI with a 2006 MRI, Dr. Gauthier stated that, while some of the changes mentioned regarding the 2010 MRI were present in 2006, the changes were more

severe in 2010. R. 929. Dr. Gauthier stated that the MRI findings correlate with Plaintiff's symptomatic complaints of pain in her back and radiating pain into her legs that started to recur in 2006. R. 931. Dr. Gauthier stated he would expect someone with Plaintiff's conditions to need to get into a comfortable position, such as lying down, and to perform activities only for a limited amount of time before needing a break. R. 932. When asked whether he agreed with Plaintiff that she could not perform sedentary work for six to eight hours a day, Dr. Gauthier answered, "[w]ith what she is describing subjectively, I would agree." R. 933. Dr. Gauthier stated that while Tramadol can cause some sedation, the effect usually subsides with continued use. R. 934. Dr. Gauthier also stated, "I think [Plaintiff] makes an effort to accomplish what she wants to do and if she is saying these things [about her alleged disability], I would take that at face value." R. 935.

     C.     <u>Administrative Hearing Testimony – October 5, 2011</u>

Plaintiff testified that she became disabled in 2006, and has not been able to work since. R. 46. Prior to 2006, Plaintiff had a herniated disc, which required two surgeries, one in 1999 and another in 2003. R. 46. Plaintiff was in severe pain, which continued after the surgeries. R. 46. Plaintiff attended physical therapy and received injections in 2005 and 2006. R. 47. Her doctor advised her that she could have further surgery, but warned that it might worsen her condition. R. 47-48. Plaintiff decided against further surgery. R. 48.

In 2006, Plaintiff worked for the City of Chesapeake doing data entry. R. 48. Plaintiff testified that in 2006, she was taking medication for pain in her lower back and right leg. R. 48, 50. The medication made her "quite ill," and caused her to make errors on the job. R. 48. Plaintiff testified that her boss was not in compliance with the FMLA, and would not allow

Plaintiff to take time off.  R. 48.  When Plaintiff could no longer take the pain, and her boss would not let her take time off, she had to leave the job.  R. 48.

After 2006, Plaintiff continued to see a neurosurgeon regarding her condition.  R. 50. She continued attending physical therapy, and received two injections.  R. 50, 52.  The injections relieved the pain, but only temporarily.  R. 52.  Her doctor again advised that Plaintiff could have another surgery, but could not guarantee that it would help.  R. 51.

Plaintiff testified that she continued to have pain in her lower back and in both of her legs, though mainly in her right leg.  R. 52.  She had leg cramps when sleeping and when walking.  R. 52. She sat in a recliner for the majority of the day, with her legs elevated to help with the pain.  R. 53.  She would also lay down some during the day, and had trouble sleeping at night due to leg cramps.  R. 53-54.   This was despite taking Tramadol at night or in the late evening to help her sleep. R. 54.  She needed support on the lumbar area of her spine when sitting in a straight-back chair, and could sit for thirty minutes before needing to get up.  R. 55-56.  Her medication made it difficult for Plaintiff to think, made her drowsy, and caused her to fall asleep during the day.  R. 56.  Plaintiff testified that she could walk a block before needing to sit or lie down and rest.  R. 57.  It was difficult to walk, and she had to drag her right leg a little.  R 57.

Plaintiff testified that she wore a nitroglycerin patch for chest pain, and suffered from asthma.  R. 59.  She took cardiac medication due to a blockage.  R. 60.  She also had diverticulitis and irritable bowel syndrome.  R. 60.

The vocational expert ("VE") testified about jobs available in the national economy for a hypothetical individual of Plaintiff's age, education, and work history, with the following abilities and limitations:

14

- the ability to lift, carry, push, and pull up to ten pounds occasionally;
- the ability to stand and walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday;
- the need to avoid climbing ladders, ropes and scaffolds, and perform other postural movements only occasionally; and,
- the need to avoid concentrated exposure to respiratory irritants and extreme temperatures or humidity.

R. 62.  The VE testified that an individual with that vocational profile could perform Plaintiff's past work as a data entry clerk.  R. 62.  The VE stated a hypothetical person with the same vocational profile, who was limited to simple, routine, low-stress tasks, could not perform Plaintiff's past work, but could perform work as an assembler, cashier, or marking clerk.  R. 62-63.  The VE stated that if the hypothetical person required a sit-stand option, they would only be able to perform work as a cashier.  R. 63.  However, if the sit-stand option was for every 30 minutes, the jobs of assembler and marking clerk would be available.  R. 64.  The VE also testified that the job of rental clerk would be available with these limitations, and it would not involve any production quotas. R. 64.

In response to questions from Plaintiff's counsel, the VE testified that an individual who would need to lie in a recliner for a number of hours during the day, or was unable to complete tasks or attend work on a regular basis due to severe pain, would not be capable of performing any of the jobs discussed.  R. 65.

### III.  STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## IV. ANALYSIS

To qualify for DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

A.    ALJ's Decision – October 27, 2011

The ALJ found that Plaintiff met the insured status requirement through December 31, 2011. R. 24. At step one of the five-step analysis, he concluded that Plaintiff had not engaged in substantial gainful activity since July 1, 2006, the alleged onset date.  R. 26.[3]  At step two, the ALJ found that Plaintiff's back disorder was a severe impairment.  R. 26. The ALJ found the other alleged impairments, including congestive heart failure/coronary artery disease, asthma, diverticular disease, internal hemorrhoids, mass near left thumb, pain in right wrist,

---

[3] The ALJ addressed Plaintiff's work in July 2008, which was of such a short duration that it did not rise to the level of substantial gainful activity.  R. 26.

hypertension, and irritable bowel syndrome, did not meet the requirements to be considered severe. R. 26-27. After considering the four broad functional areas set out in the disability regulations for evaluating mental disorders, the ALJ found Plaintiff's depression did not cause more than minimal limitation in her ability to perform basic mental work activities, and was non-severe. R. 28-29. At the third step, the ALJ concluded Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 29.

After summarizing the medical record, the ALJ found Plaintiff had the residual functional capacity ("RFC") to "lift, carry, push and pull up to 10 pounds occasionally, stand and/or walk about six hours and sit six hours within an eight-hour workday. [Plaintiff] has to avoid climbing ladders, ropes and scaffolds but she can perform other postural movements on an occasional basis. In addition, [Plaintiff] has to avoid concentrated exposure to respiratory irritants." R. 29.

At the fourth step, the ALJ found Plaintiff was capable of performing her past relevant work as a data entry clerk. R. 33. Based on these findings, the ALJ concluded that Plaintiff had not been under a disability as defined by the Social Security Act from July 1, 2006, through the date of the decision. R. 33.

B.    There is Not Substantial Evidence in the Record to Support the ALJ's Decision

The ALJ failed to properly evaluate Plaintiff's credibility and the medical opinion evidence. Consequently, there is not substantial evidence in the record to support the ALJ's decision, and the undersigned recommends that the decision be reversed and remanded.

1.    The ALJ Failed to Properly Evaluate Plaintiff's Credibility

Due to the errors made in the ALJ's evaluation, there is not substantial evidence in the record to support the ALJ's finding that Plaintiff was not entirely credible. R. 32. The ALJ uses

18

a two-step analysis in evaluating a claimant's subjective complaints. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably produce the claimant's pain or symptoms. *Id.* In doing so, the ALJ must consider all relevant medical evidence in the record. *Id.* If the underlying impairment could reasonably be expected to produce the claimant's pain, the ALJ must then evaluate the claimant's statements about the intensity and persistence of the pain, as well as the extent to which it affects the individuals' ability to work. *Id.* at 595. The ALJ's evaluation must take into account all available evidence, including a credibility finding of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the claimant's subjective statements. *Id.* at 595-96.

This Court must give great deference to the ALJ's credibility determinations. *See e.g., Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488-91 (1951). The Fourth Circuit has held, "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997) (internal citations omitted). Therefore, this Court must accept the ALJ's assessment of Plaintiff's credibility unless it is unreasonable, contradicts other factual findings, or is based on an insufficient reason. *Id.*

Furthermore, as the Fourth Circuit recognizes, the Plaintiff's subjective statements about her pain are not, alone, conclusive evidence that plaintiff is disabled. 20 C.F.R. § 404.1529(a). Rather, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 591-92 (4th Cir. 1996). Finally, Social Security Ruling 96-7p states that the evaluation of a Plaintiff's

subjective complaints must be based on consideration of all the evidence in the record, including, but not limited to: (1) medical and laboratory findings; (2) diagnoses and medical opinions provided by treating or examining physicians and other medical sources; and (3) statements from both the individual and treating or examining physicians about the claimant's medical history, treatment, response, prior work record, and the alleged symptoms' effect on the ability to work.

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Plaintiff's statements "concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with" the ALJ's RFC determination.[4]   R. 31-32.   In reaching the determination regarding Plaintiff's credibility, the ALJ first summarized Plaintiff's statements about her inability to work due to back pain, chest pain, pain in her legs, impaired concentration, irritable bowel syndrome, shortness of breath, and fatigue. R. 30. Plaintiff testified that she was unable to work beginning in July 2006 because she had difficulty getting up in the morning due to back and leg pain, was able to sit up to one-half hour at a time, must lie down when fatigued, had to drag her right leg a little when she walked, had chest pain due to stress, had shortness of breath with some physical movement, had problems with balance, and had problems due to irritable bowel syndrome. R. 30. The ALJ found Plaintiff was not credible and offered the following

---

[4] While not necessitating remand, the ALJ's finding that that Plaintiff's statements were "not credible to the extent they [were] inconsistent with" the ALJ's RFC assessment, is concerning in this case where the ALJ failed to properly evaluate Plaintiff's credibility and the medical opinion evidence. This language appears as boilerplate language in any number of decisions by ALJs throughout the United States. *See e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 644-645 (7th Cir. 2012); *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). This language is problematic because it implies that an RFC determination was made prior to a determination of Plaintiff's credibility, when the RFC determination should be made with all available evidence, including the credibility determination. *See* 20 C.F.R. § 404.1529(c)(4); *see also Bjornson*, 671 F. 3d at 645 ("A deeper problem is that the assessment of a claimant's ability to work will often . . . depend[] heavily on the credibility of her statements."); *but see Soghoian v. Colvin*, No. 1:12cv1232, 2014 WL 996530, at *9 (E.D. Va. Mar. 13, 2014) (holding remand is not necessary where "it is clear that the ALJ followed the appropriate two-step process and performed the credibility assessment as part of the overall RFC assessment"); *Racey v. Astrue*, 2013 WL 589223, at *6 (W.D. Va. Feb. 13, 2013) (holding that, despite boilerplate language, ALJ provided sufficient support for his RFC finding and determination of plaintiff's credibility).

reasons: (1) Plaintiff "has not required more than conservative treatment since her alleged onset of disability;" (2) "findings from the physical examinations, including a normal gait, good range of motion and good muscle strength do not support [Plaintiff's] subjective complaints;" (3) Plaintiff "continued to smoke against medical advice, which is not behavior consistent with her complaints of 'disabling' pain;" (4) Plaintiff's "reported restrictions in daily activities are out of proportion to the objective findings f[ro]m examinations and the conservative course of treatment she has required;" and, (5) [t]here is no convincing evidence of significantly adverse side effects from the use of prescribed medications in the record." R. 31.

a.   <u>Findings that "Conservative Treatment" and Objective Examinations Do Not Support Plaintiff's Subjective Complaints</u>

Plaintiff argues the findings by the ALJ that Plaintiff "has not required more than conservative treatment since her alleged onset of disability," that the findings from physical examinations "do not support Plaintiff's subjective complaints," and that Plaintiff's "reported restrictions in daily activities are out of proportion to the objective findings f[ro]m examinations and the conservative course of treatment she has required," are not supported by the record. Pl.'s Mem. 15-23; R. 31. The undersigned agrees. The ALJ's characterization of Plaintiff's treatment for her degenerative disc disease as "conservative" is not accurate; and, the fact that some of Plaintiff's physical examinations resulted in normal findings does not contradict Plaintiff's testimony.

The treatment Plaintiff has undergone as a result of her degenerative disc disease, two back surgeries and multiple epidural steroid injections, cannot be labeled conservative. Although the surgeries and initial steroid injections predated Plaintiff's alleged onset date, they cannot be ignored when determining the options Plaintiff explored in an effort to alleviate her symptoms. Initially, the ALJ states, Plaintiff "has not required more than conservative treatment since her

21

alleged onset of disability." R. 31. Later, when discounting Plaintiff's credibility, the ALJ found Plaintiff's reported restrictions in daily activities were out of proportion to the "conservative course of treatment she has required."[5] R. 31.

The record reflects Plaintiff underwent surgery in 1999 and 2003 for disc ruptures, and the surgeries appear to have alleviated pain for a period of time. R. 776 (attributing "good result" to the 1999 surgery); R. 698 (noting "complete relief of her pain" following Plaintiff's 2003 surgery). However, in 2005, Plaintiff experienced increased pain in her back radiating into her right leg with parasthesia. R. 256, 258. A 2005 MRI demonstrated a new disc herniation. R. 256. A 2006 MRI showed progression of the disc protrusion/extrusion along with another disc bulge. R. 956. Further, an MRI performed in 2010 discusses the complications caused by scar tissue from the prior surgeries, potentially leading to further encasement of the nerve root, as well as recurrent disc protrusion, "severe foraminal stenosis and likely impingement of the L5 nerve root." R. 559-60.

When Plaintiff experienced symptoms of pain following her two surgeries, Plaintiff's doctors did not recommend further surgery. R. 252, 898. Plaintiff testified her doctors advised that further surgery might worsen her pain and there was no guarantee it would help. R. 47-48, 51. Instead, Plaintiff was referred to pain management, and her pain was treated with steroid injection therapy. R. 250-51, 253, 979, 985. The record reflects Plaintiff received some temporary relief from injections in 2005 and 2006. R. 253 (noting less numbness in Plaintiff's right lower limb, and that Plaintiff was "somewhat better" after two injections in 2005); R. 250-53 (noting Plaintiff was better, but still having bilateral leg symptoms following a 2006 injection).

---

[5] The ALJ also found the restrictions to be out of proportion to the objective findings on physical examinations, which will be discussed later. R. 31.

Although Plaintiff sought medical treatment for several other conditions, and presumably continued taking pain medication, the record does not reflect further epidural injections for Plaintiff's degenerative disc disease from July 2006 through July 2010. R. 464-65 (in October 2006, Plaintiff's fatigue was better after cutting back on Toprol and she was treated for hyperlipidemia), R. 447 (in July 2007, Plaintiff was diagnosed with restless leg syndrome and abnormal fasting glucose), R. 570-71 (in February 2008, a bone density study showed osteopenia), R. 349-50 (in March 2008, Plaintiff was seen in the emergency room for abdominal pain); R. 361 (in November 2009, Plaintiff was treated for chest pain), R. 378, 1089-90 (in May and June 2010, Plaintiff was treated for irritable bowel syndrome). In July 2010, an examination revealed decreased sensation, slow gait, pain on range of motion testing, and lumbar spine tenderness to palpation. R. 401. Plaintiff received further steroid injections in September 2010 and January 2011. R. 979.

The fact that Plaintiff's doctors did not recommend further surgery, especially in light of evidence that earlier surgeries may have contributed to some of Plaintiff's symptoms, adequately explains the lack of surgical intervention following Plaintiff's alleged onset date. There is a four year gap in Plaintiff's receipt of epidural steroid injections. However, MRI test results show her condition was worsening during that time. R. 929. While the gap in steroid injections is a valid factor to be considered by the ALJ, it was not discussed in the opinion. Further, this gap alone does not relegate the steps Plaintiff was willing to take to alleviate her symptoms to "conservative treatment."

The ALJ further relies on "normal findings" during physical examinations to discredit Plaintiff's statements about her symptoms. However, the normal findings on which the ALJ relies (a normal gait, good range of motion, and good muscle strength) do not contradict

Plaintiff's testimony about her symptoms.   Plaintiff admitted that she could walk a block before needing to sit down to rest, and she could sit in a straight-back chair for thirty minutes before needing to stand up.  R. 55-57.  Despite this, she often had to sit in a recliner with her legs up, or use heat to help alleviate her pain.  R. 52.

Dr. Vargas explained that Plaintiff was describing "pace setting," which is the ability to perform some activities for a limited amount of time before needing to take a break.  R. 932.  He stated that when someone with Plaintiff's condition "over do[es]" it, they "really aggravate their symptoms."  R. 932.  Dr. Vargas explained that "when you have the minimal space around the nerve roots as they come out activity can move the nerve roots in those limited spaces.  That causes pain and inflammation."  R. 932.  Consequently, the fact that, during some physical examinations, Plaintiff had a normal gait, good range of motion, and good muscle strength, does not contradict her testimony of disabling pain.  In addition, MRI testing during the relevant period resulted in objective evidence of Plaintiff's condition.

Considered in context, the physical examinations on which the ALJ relied do not discredit Plaintiff's statements regarding her symptoms.  For instance, the ALJ noted Dr. Koen's report, in March 2006, that Plaintiff was toe and heel walking normally with good strength.  R. 30, 252.  This examination took place after Plaintiff had undergone her third epidural injection.  R. 252.  As noted by the ALJ, "an MRI showed some possible progression of a known disc herniation at L4-5."  R. 30-31, 252.  As opposed to finding that Plaintiff was "doing well" (R. 31), Dr. Koen found she was "managing well at this point."  R. 252.

On examination at the neurosurgical clinic in September 2010, Plaintiff exhibited full muscle strength in the lower extremities, intact sensation, full range of lumbar motion, negative straight leg-raising, normal gait, and intact heel-toe and tandem walking.  R. 897.  Despite these

24

findings, her doctor recommended steroid injection therapy to help with Plaintiff's symptoms, which Dr. Gauthier administered the same month. R. 985.

Similarly, on examination in December 2010, Plaintiff had intact neurological functioning, and the doctor noted she had no difficulty getting on and off of the examining table. R. 882. The doctor recommended that Plaintiff receive another steroid injection. R. 882. Clearly, these normal findings during physical examinations do not indicate Plaintiff was no longer experiencing pain as the doctors were simultaneously recommending Plaintiff receive further steroid injections.

Accordingly, the record does not support the ALJ's conclusion that Plaintiff's testimony about her symptoms was not entirely credible because her treatment was conservative and she had normal findings on examinations.

        b.    <u>Finding Regarding Plaintiff's Continuing to Smoke</u>

Next, Plaintiff argues the ALJ committed error in finding Plaintiff's continuing to smoke against medical advice was not behavior consistent with her complaints of disabling pain. R. 31; Pl.'s Mem. 21-22, citing *Shramrek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000) (holding a Plaintiff's failure to give up smoking is "an unreliable basis on which to rest a credibility determination"); *see also O'Donnell v. Barnhart*, 318 F.3d 811, 819 (8th Cir. 2003) (holding it was improper for the ALJ to rely on Plaintiff's failure to stop smoking to discredit her credibility). The Fourth Circuit has not held that it is error for an ALJ to consider failure to stop smoking when making a credibility determination, and at least one court has upheld a decision finding a claimant not credible in part because she continued to smoke against medical advice. *See Douglas v. Comm'r of Social Sec.*, No. 6:11cv43, 2012 WL 5929322 (W.D. Va. Nov. 7, 2012), *report and recommendation adopted*, 2012 WL 5941469 (W.D. Va. Nov. 27, 2012). The

undersigned does not find reversible error. However, the undersigned agrees that Plaintiff's continuing to smoke against medical advice under the circumstances in this case has little relevance when determining her credibility.

### c. Finding of No Significant Adverse Medication Side Effects

Next, Plaintiff contends the ALJ's reliance on a lack of "convincing evidence of significantly adverse side effects" from Plaintiff's medication was misplaced. Pl.'s Mem. 22-23. Plaintiff testified during her hearing that her medication made her feel ill. R. 48. Plaintiff points out that in May 2006, prior to her alleged onset date, it was noted in two documents that Plaintiff was fatigued, drowsy, and prone to falling asleep at work. R. 483, 487. Dr. Gauthier stated that while Tramadol can cause some sedation, it usually subsides with continued use. R. 933. Under these circumstances, it was not reversible error for the ALJ to find, "no convincing evidence of significantly adverse side effects from the use of prescribed medications in the record." R. 31.

### d. Failure to Find Substantial Credibility Based on Work Record

Plaintiff asserts her prior work record should have been recognized as an enhancing factor with respect to her credibility. Pl.'s Mem. 24. After making his credibility determination, and in the section of the opinion discussing Plaintiff's past work, the ALJ noted that Plaintiff "worked as a data entry clerk from 1995 to 2006." R. 33. However, the ALJ should have considered Plaintiff's work record when determining her credibility. *See* 20 C.F.R. § 404.1529(c)(3) (providing the Commissioner "will consider all of the evidence presented, including information about your prior work record . . . ."). While this error alone would not require remand, this factor should be addressed when evaluating Plaintiff's credibility on remand.

While each of the ALJ's findings, when considered alone, may not constitute reversible

26

error, when compounded, the inaccurate deductions make it impossible to find substantial evidence to support the ALJ's conclusion. The ALJ's reliance on "conservative treatment," and "normal" physical examination findings to discredit Plaintiff's statements about her symptoms is concerning by itself. In addition, the ALJ does not cite to evidence that Plaintiff's daily activities were inconsistent with her testimony regarding her symptoms. *See e.g. Stanley v. Barnhart*, 116 Fed. Appx. 427, 429 (4th Cir. Nov. 18, 2004) (holding the ALJ properly discounted the medical opinions where the "bulk of the evidence" indicated her daily activities were not affected to the extent she alleged). Instead, the ALJ finds Plaintiff's "reported restrictions in daily activities are out of proportion to the objective findings f[ro]m examinations and the conservative course of treatment she has required." R. 31. Moreover, the reasons given for discounting the opinions of the treating and examining physicians are (1) the normal findings on physical examinations, and (2) the physicians' reliance on Plaintiff's subjective complaints, which the ALJ found were not entirely credible. There is not substantial evidence to support the ALJ's decision, which is based on compounded inaccurate conclusions.

### 2. The ALJ Failed to Properly Evaluate the Opinion Evidence

Plaintiff objects to the ALJ's findings because the ALJ erroneously gave Plaintiff's treating physician, Dr. Gauthier, "little weight," while assigning "significant weight" to the opinions of the non-examining state agency consultants. R. 32; Pl.'s Mem. 26, ECF No. 13. Further, Plaintiff asserts the ALJ erred by failing to discuss or assign weight to Dr. Mayer's opinion. Pl.'s Mem. 26. Defendant argues that the ALJ correctly discounted Dr. Gauthier's opinion, as it was inconsistent with substantial medical evidence in the record and relied heavily on Plaintiff's subjective complaints. Def.'s Mem. 18-19, ECF No. 15. As for the ALJ's failure to address Dr. Mayer's opinion, Defendant asserts it was harmless error. Def.'s Mem. 20.

The ALJ found Plaintiff capable of standing or walking about six hours, and capable of sitting for six hours, within an eight-hour workday. R. 29. In doing so, the ALJ rejected the opinions of Plaintiff's treating physician and the state agency consultative examiner, and relied on the opinion of the two non-examining state agency consultants. The reasons the ALJ cites for assigning the respective weight to the medical opinions are not supported by the record. Accordingly, the Court finds the ALJ committed error by discounting the opinions of the treating and examining physicians, and relying solely on the non-examining physician's opinions.

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. §§ 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* at 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1545(a)(3).[6] The ALJ is required to explain in his decision the weight assigned to *all* opinions, including treating sources, non-treating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 416.927(e)(2)(ii).

Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(c)(2). Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. However, if a treating physician's

---

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

28

opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed

using all of the factors" provided by the regulations. SSR 96-2, 1996 WL 374188, at *5 (S.S.A.);

*See Burch v. Apfel*, 9 Fed. App'x 255, 259 (4th Cir. 2001) (per curiam); *see also Newton v. Apfel*,

209 F.3d 448, 456 (5th Cir. 2000) (joining other federal courts in requiring the ALJ to consider

§ 404.1527(c) factors when declining to give controlling weight to the treating physician's

opinion, and noting that ALJ should consider factors on remand).   Those factors are: (1) the

length of the treatment relationship and the frequency of examination; (2) the nature and extent

of the treatment relationship; (3) the degree of supporting explanations for their opinions; (4)

consistency with the record; and (5) the specialization of the physician. 20 C.F.R.

§§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

     Therefore, when the ALJ's decision is not fully favorable to the claimant, the decision

must contain

> specific reasons for the weight given to the treating source's medical
> opinion, supported by the evidence in the case record, and must be
> sufficiently specific to make clear to subsequent reviewers the weight the
> adjudicator gave to the treating source's medical opinion and the reasons for
> that weight.

SSR 96-2, 1996 WL 374188, at *5 (S.S.A.). This specificity requirement is necessary because

the reviewing court

> face[s] a difficult task in applying the substantial evidence test when the
> [Commissioner] has not considered all relevant evidence. Unless the
> [Commissioner] has analyzed all evidence and has sufficiently explained
> the weight he has given to obviously probative exhibits, to say that his
> decision is supported by substantial evidence approaches an abdication of
> the court's 'duty to scrutinize the records as a whole to determine whether
> the conclusions reached are rational.'

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d

396, 397 (4th Cir. 1974)).

a.   Plaintiff's Treating Pain Management Physician - Dr. Gauthier

Dr. Michael E. Gauthier with Chesapeake Bay Pain Medicine treated Plaintiff for pain associated with her degenerative disc disease beginning in 2010. R. 926-35. Dr. Gauthier performed two epidural steroid injections, one in September 2010 and one in January 2011. R. 927. After reviewing documentation of Plaintiff's past MRI results, her surgeries, her physical therapy, and her previous pain management treatment, Dr. Gauthier stated that in his opinion the MRI findings correlate with Plaintiff's symptomatic complaints of pain in her back and radiating pain into her legs that started to recur in 2006. R. 931. Dr. Gauthier stated he would expect someone with Plaintiff's condition to need to get into a comfortable position, such as lying down, and to perform activities only for a limited amount of time before needing a break due to pain. R. 932. When asked whether he agreed with Plaintiff that she could not perform sedentary work for six to eight hours a day, Dr. Gauthier answered, "[w]ith what she is describing subjectively, I would agree." R. 933. Dr. Gauthier added that Plaintiff "was a pleasant, compl[ia]nt lady and I think she makes an effort to accomplish what she wants to do and if she is saying these things, I would take that at face value." R. 935.

The ALJ discounted the opinion because Dr. Gauthier did not start treating Plaintiff until four years after her onset date, did not see Plaintiff regularly, and had not seen Plaintiff recently. R. 32. The ALJ stated Dr. Gauthier "did not question the credibility of [Plaintiff's] subjective complaints." R. 32. As a result, the ALJ discounted Dr. Gauthier's opinion that Plaintiff could not perform sedentary work, finding the opinion was based on Plaintiff's subjective complaints, which were not entirely credible. R. 32. Lastly, the ALJ found that "although the MRI from July 2010 showed evidence of a compromised nerve root, the findings from physical examinations have been relatively normal." R. 32. Consequently, the ALJ assigned Dr.

30

Gauthier's opinion little weight. R. 32. The ALJ's discussion of the length and frequency of Dr. Gauthier's treatment of Plaintiff is a valid factor to be considered in weighing Dr. Gauthier's opinion; however, the remaining reasons listed for discounting the opinion are not supported by the record.

The ALJ mischaracterizes Dr. Gauthier's testimony regarding Plaintiff's subjective complaints. Dr. Gauthier found that Plaintiff's subjective complaints correlated with her medical history and MRI results. R. 931. He later stated that Plaintiff's subjective complaints were consistent with her underlying condition. R. 933. Read in context, Dr. Gauthier's opinion regarding Plaintiff's ability to work is based on his experience treating Plaintiff and his review of her medical history, as well as her subjective statements, which he found to be credible. The undersigned agrees with Plaintiff that her treating doctor's opinion that she is credible should weigh in her favor with respect to the ALJ's credibility finding. Pl.'s Mem. 30. Instead, the ALJ here found Plaintiff lacked credibility. Then, the ALJ used this credibility finding to discount her treating doctor's opinion, which was based in part on Plaintiff's subjective complaints. Because the ALJ's reasons for discrediting Plaintiff's statements regarding her symptoms are inadequate, as discussed in section IV.B.1., the ALJ's finding that her treating physician's opinions should be discounted due to reliance on Plaintiff's subjective complaints is similarly unjustified.

Further, the last reason the ALJ cites for discounting Dr. Gauthier's opinion is that the findings from physical examinations had been relatively normal. R. 32. The normal findings on physical examination are not inconsistent with Dr. Gauthier's opinions for the reasons discussed in section IV.B.1. While the length and extent of Dr. Gauthier's treatment relationship with Plaintiff is a valid reason to discount Dr. Gauthier's opinion, the remaining reasons given for

discounting the opinion are not supported by the record. Accordingly, there is not substantial evidence to support the ALJ's finding that Dr. Gauthier's opinion is entitled to little weight. R. 32.

b.  State Consultative Examiner – Dr. Vargas

On May 23, 2010, Gustavo Vargas, M.D., a state agency consultant, performed a physical examination of Plaintiff and produced a medical consultant report. R. 369-376. Following a review of Plaintiff's medical history, and an examination of Plaintiff, Dr. Vargas found Plaintiff was able to walk for half a mile with breaks, sit for one hour, stand straight for half an hour approximately, and perform fine finger manipulation without limitation. R. 375. Dr. Vargas further concluded Plaintiff had moderate limitations for lifting 40 pounds, extreme climatic conditions, frequent activity going up and down stairs and ladders, and persistent bending and crouching. R. 375.

The ALJ assigned "minimal weight" to Dr. Vargas's opinions because they were not consistent with his objective findings during Plaintiff's examination, not consistent with findings during other physical examinations, and "based mainly on the subjective complaints of [Plaintiff], which are not entirely credible." R. 32. This reasoning is again inadequate as it is based on the faulty assumption that normal findings on physical examination are not consistent with Plaintiff's symptoms. Similar to Plaintiff's treating physicians, who prescribed steroid injections to help with Plaintiff's pain on occasions where examination resulted in normal physical findings, Dr. Vargas limited Plaintiff based on her condition even though his examination resulted in normal physical findings. Consequently, there is not substantial evidence in the record to support the ALJ's finding that Dr. Vargas's opinion is entitled to minimal weight.

32

c.  Treating Physician Dr. Mayer

On March 3, 2006, Kenneth Mayer, M.D., completed two forms for Plaintiff, a DMV disabled parking application form and a certification of health care provider regarding the FMLA. R. 626-28. Dr. Mayer checked a box on the DMV form stating that, due to degenerative disc disease, Plaintiff is permanently disabled as it relates to disabled parking privileges, which means Plaintiff has "a physical condition that limits or impairs movement from one place to another or the ability to walk as defined in Va. Code § 46.2-1240, and that has reached the maximum level of improvement and is not expected to change even with additional treatment." R. 626. Dr. Mayer opined in the certification pursuant to the FMLA that Plaintiff could be incapacitated up to three days per month, possibly "longer for escalating" symptoms. R. 627. When asked whether Plaintiff was "unable to perform work of any kind," Dr. Mayer responded "no." R. 628.

The ALJ failed to address either of these forms in his decision. Defendant asserts this was harmless error. Def.'s Mem. 16. The undersigned finds it was error for the ALJ to fail to even mention in his decision Dr. Mayer's opinions expressed in these two forms. The ALJ's failure to address Dr. Mayer's opinion that Plaintiff required a disabled parking placard was harmless error. R. 626, 628. *See Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (holding a doctor's ordering a disability placard "adds nothing to a finding of disability here because there is no evidence that the two have substantially similar requirements for finding a person to be disabled"); *Halsell v. Astrue*, 357 F. App'x 717, 722-24 (7th Cir. 2009) (holding the ALJ properly discredited a doctor's disability placard application due to the differing standards); *Meador v. Barnhart*, No. 7:05cv547, 2006 WL 1319627, at *7 (W.D. Va. May 9, 2006) (holding the ALJ did not err by failing to address a DMV handicap placard application because the doctor

"rendered no opinion as to plaintiff's disability or limitations under the Social Security Act"). More importantly, the ALJ should have addressed Dr. Mayer's statement in the FMLA form that Plaintiff may miss work up to three days a month or more due to her symptoms from coronary artery disease and lumbar disc disease.  R. 627.  While the failure to address the opinions contained in these forms alone would not require remand, this error should be addressed on remand.

### d.   Non-Examining State Agency Physicians

After discounting the opinions of the doctors who treated or examined Plaintiff, the ALJ gave "significant weight" to the opinions of the non-examining state agency physicians, "because these conclusions are generally consistent with the objective medical evidence."  R. 32. These non-examining physicians concluded the medical evidence showed that Plaintiff had a good ability to stand and walk throughout a normal workday; Plaintiff's overall condition did not preclude her from performing all work activities; and, Plaintiff's "condition is not of the level of severity to be disabling."  R. 84-85, 87-98.

Because the reasons cited by the ALJ for discounting the opinions of the treating and examining physicians are not supported by the record, those opinions should be afforded more weight than the non-examining physicians' opinions.  *See* 20 C.F.R. § 404.1527(c) (providing that medical opinions from examining and treating physicians are given more weight than those of non-examining, non-treating physicians).  This is not a situation where the medical opinions from examining and treating physicians are conflicting. *See Gordon v. Sweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (holding ALJ can side with the non-examining, non-treating physician if the medical expert testimony from examining or treating physicans "goes both ways").  Therefore, the undersigned finds the ALJ failed to properly evaluate the opinion evidence.

34

Dr. Gauthier found Plaintiff could perform activities only for a limited amount of time before needing a break due to pain. R. 932. Dr. Vargas found Plaintiff was able to walk for half a mile with breaks, sit for one hour, and stand straight for half an hour approximately. R. 375. The ALJ assigned little weight and minimal weight to those opinions respectively, and relied on the non-examining, non-treating physicians' opinions that Plaintiff had a good ability to stand and walk throughout a normal workday. R. 84-85, 87-98. The ALJ concluded Plaintiff had the residual capacity to stand and or walk for six hours, and sit for six hours within an eight-hour workday. R. 29.   Due to the ALJ's reliance on inaccurate assumptions, there is not substantial evidence in the record to support the ALJ's decision.

## V.  **RECOMMENDATION**

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 11) be GRANTED in part, the Commissioner's Cross Motion for Summary Judgment (ECF No. 13) be DENIED, and the final decision of the Commissioner be VACATED and REMANDED for further analysis consistent with this Report and Recommendation.

## VI.  **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
May 28, 2014